Marshall, C. J.
 

 In disposing of this case we disclaim any purpose to overturn the general doctrine
 
 non allegata non probata,
 
 but, on the contrary, the conclusions we have reached are upon the theory that that doctrine has no application to the instant case for two reasons:
 

 First. Enough appears in the pleadings to show that the contract was not one where grain was actually sold or expected to be delivered, but, on the contrary, was an “executory contract which the party paying or to pay does not intend to complete by receiving or delivering the whole of that which is so contracted for, but to resell before the time fixed by contract for such delivery or at such time to pay or receive the difference between the con tract price and the market price.”
 

 
 *211
 
 Second. Counsel have sought to invoke the court’s jurisdiction and to secure the court’s judgment in a controversy where a full disclosure of all the details clearly demonstrates that the transaction was one which was contrary to the statutes of Ohio. In the introduction of evidence counsel were studiously avoiding the disclosure of the true character of the dealings of the parties. Under well-settled principles a court will not lend its aid to any illegal contract, but, on the contrary, will leave the parties where it finds them and where they have placed themselves. By mutual petition and cross-petition the parties have prayed the court to close its eyes to those features which would render their contract null and void, and look only to the contract unaffected by the prohibitory and penal statutes, and now urge that, by the simple expedient of omitting to make reference to the statute, or to attach the label of illegality, the court is charged 'with the mandatory duty to entertain jurisdiction. The conclusive answer to this is that jurisdiction of the subject-matter cannot be conferred by consent. Counsel in this case, in urging that the court erred in propounding to witnesses questions which were designed to develop the true character of the transaction, and in charging the jury as to the law upon the facts thus developed, have a mistaken notion as to the true function to be discharged by the judge in presiding over a jury trial. The judge is not a mere sergeant at arms to preserve order in the court room. His chief function is to prevent injustice being done between the parties, and, as a corollary thereto, to see that justice is actually administered. It is no answer to this proposition to
 
 *212
 
 say that the parties were willing to disregard the statutes which declare their transaction to be illegal. The public has an interest in the orderly trial of litigation, and the judge who presided over this case not only acted within his rights, but would have been remiss in his duty if he had done otherwise.
 

 Having thus briefly disposed of the procedural question, we now approach the further problem whether the state bucket shop statutes are operative against the federal Grain Futures Act. It is contended by King & Co. that the state statutes are repugnant to the federal statutes and the commerce clause of the federal Constitution, and this presents the sole remaining question for determination. The Ohio state statutes are found in Sections 13069 to 13080, inclusive, General Code, and, briefly summarized, provide that contracts in the nature of options to sell or buy at a future time grain or other commodity are unlawful, and that all such contracts shall be void. The test of illegality is whether or not there was an intent not to deliver the commodity sold, but an intent only that the losing party make payment of differences upon the market’s rise or fall. A bucket shop is defined as a place where the proprietor conducts the business of making contracts respecting the purchase and sale of commodities wherein either party intends that such contracts may be closed or settled upon the basis of the public market quotations of prices made on any board of trade or exchange upon which the commodities or securities referred to in such contracts are dealt in by competitive buying and selling, and without a
 
 bona fide
 
 transaction on such board of trade or exchange.
 

 
 *213
 
 The word “margin” means money paid or agreed to be paid upon executory contracts which the party paying or to pay does not intend to complete by receiving or delivering the whole of that which is so contracted for, but to resell before the time fixed by contract for such delivery, or at such time to pay or receive the difference between the contract price and the market price. One of the requirements of the statute is that every commission merchant engaged in the business of buying and selling for others shall within three days thereafter furnish to the customer or principal a written statement containing the names of the parties from whom such property was bought, or to whom it shall have been sold, as the case may be, the time when, the place where, and the price at which, the same was either bought or sold. This provision is found in Section 13077, and was evidently intended as a check upon commission merchants and a means of determining whether or not the transaction was a
 
 bona fide
 
 sale. The evidence brought out by the examination of the judge clearly demonstrated that this transaction was one which was forbidden by the state statutes, and the question before us is therefore narrowed to the determination of the scope and meaning of the commerce clause (Article I, Section 8) of the federal Constitution and the Grain Futures Act of September 21, 1922.
 

 For the purposes of that act, interstate commerce was declared to mean “commerce between any state, territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same state, territory, or
 
 *214
 
 possession, or the District of Columbia, but through any place outside thereof, or within any territory or possession, or the District of Columbia.” It was further declared that “a transaction in respect to any article shall be considered to be in interstate commerce if such article is part of that current of commerce usual in the grain trade thereby grain and grain products and by-products thereof are sent from one state with the expectation that they will end their transit, after purchase, in another *
 
 *
 

 In Section 3 of the act (Section 5668c, Barnes’ Fed. Code; U. S. Code, p. 87, Tit. 7, Section 5 [U. S. Comp. St., Section 8747-4/5b]), it is declared that transactions in grain involving the sale thereof for future delivery, commonly called “futures,” are affected with a “national public interest,” and that such transactions are carried on in large volume by the public generally, and by persons engaged in the business of buying and selling grain in interstate commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and foreign countries as a basis for determining the prices and to facilitate the movements thereof in interstate commerce; that such transactions are utilized by persons engaged in handling grain in interstate commerce as a means of hedging themselves against loss through price fluctuations; that such “transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in . the prices thereof frequently oqcur as a result of. such speculation, manipulation, or control, which
 
 *215
 
 are detrimental to the producer or the consumer, *
 
 * *
 
 and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain * *
 

 Section
 
 4
 
 of the act (Section 5668d, Barnes’ Fed. Code; IT. S. Code, p. 88, Tit. 7, Section 6 [U. S. Comp. St., Section 8747-4/5e]) declares it to be unlawful to deliver in interstate commerce any offer to make or execute any contract of sale of grain for future delivery subject to the rules of any board of trade in the United States, or to make or execute such contract of sale which may be used for hedging any transaction in interstate commerce in grain, or for determining the price basis of any such transaction in interstate commerce, or for delivering grain sold, shipped, or received, in interstate commerce for the fulfillment thereof, except, first, where the seller is the owner or grower of the actual physical property purchased or sold, or the owner or renter of land on which the same is to be grown, or an association of owners or growers, or owners or renters of land; second, where “such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a ‘contract market,’ as hereinafter provided, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery * *
 

 The purpose of the act is to regulate boards of trade, and to permit certain transactions in grain only in certain boards of trade which have been designated by the Secretary of Agriculture as a
 
 *216
 
 contract market, and to regulate transactions in interstate commerce relating to sales of grain for a future delivery, and to declare the same unlawful unless they come within the two exceptions stated in Section 4 of the act.
 

 Counsel for King & Co. make the hroad assertion that by the enactment of the G-rain Futures Act the federal government has been placed in exclusive possession of the field of regulation of all transactions in grain in interstate commerce, whether the same are cash transactions or for future delivery, and that the Ohio statute expressly prohibits that which the federal statute expressly permits, and that there is therefore such conflict between the two that, by reason of the interstate character of the transaction, the federal statutes must prevail, and that the state statute prohibiting dealings in futures in grain can have no application so long as the orders are executed upon or through a board of trade which has been designated as a contract market.
 

 It should be stated at the outset that the federal statute is penal in its nature, and it will be conclusively presumed, therefore, that there was some existing public evil which Congress desired to remedy, and therefore conducted an investigation through the instrumentality of the Federal Trade Commission, and took an enormous volume of evidence, and reached the conclusions which are set forth in Section 3 of the act. Without again reviewing that declaration, it is sufficient to say that the existing evil was speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices of grain, which were de
 
 *217
 
 dared to frequently occur as a result of such speculation, manipulation, or control, and which were further declared to be detrimental to the producer, the consumer, and persons handling grain in interstate commerce. It follows that regulation of speculation and manipulation must have been intended as a means of limiting the same, and that Congress could not have intended to encourage and promote that which it had in the same breath declared to be an evil. ■ It is perfectly evident that the Federal Trade Commission as well as Congress had reached the conclusion that widespread unrestrained speculation was such a potent cause of sudden fluctuations in prices as to become an obstruction to and a burden upon interstate commerce in grain. Having declared the existence of an evil, one of the remedies provided was that all transactions and dealings in grain for future delivery in interstate commerce should be through certain favored boards of trade to be designated by the Secretary of Agriculture, and it was further provided that all such contracts should be “evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery.” Referring to the record in the instant case, and especially to the exhibits, it will be found that the transaction wholly failed to comply with Section 4 of the act. The memoranda of sales show that Horton was the seller, but the name of the buyer was not disclosed. It developed by the examination of the judge that the other names appearing upon the memoranda were the names of brokers and agents. So far
 
 *218
 
 as the memoranda disclose, as explained to the judge, the grain had not been sold to any particular person or firm, but, on the contrary, the transactions were upon their face what the parties have admitted them to be, viz. a dealing in margins, where the seller and the broker mutually agreed to settle profits or losses upon the rise or fall of the market. Each of the written memoranda contains the following:
 

 “On all marginal business we reserve the right to close transactions when margins are running out without giving further notice.”
 

 When the transactions were closed out on August 25th, the memoranda were likewise deficient by reason of failing to name parties. For this reason, therefore, the plaintiff fails to come within the technical requirements of the Grain Futures Apt.
 

 In logical sequence we should next inquire whether these transactions were in interstate commerce.
 

 Much of the grain grown in this country is moved in interstate commerce, and it is not material to inquire what proportion is so moved, or what amount is held in storage in the so-called contract markets. It is quite certain that an enormous volume of grain is consumed within the state where it is grown. Intrastate transactions in grain which is-never transported across state lines are no part of interstate commerce, and such transactions cannot be lawfully defined as interstate commerce by congressional fiat. The broad declarations of Section 3 of the Grain Futures Act (Section 5668c, Barnes’ Fed. Code [XL S. Comp. St., 8747-4/5b]) are purely political and in no sense legislative.
 
 *219
 
 Those declarations add nothing to the act except in so far as the act commands greater respect, because they indicate that Congress has made a thorough investigation of the subject. It must, however, still be accepted as axiomatic that whatever “national public interest” attaches to transactions known as “futures” rests wholly upon fact, and to no extent upon congressional fiat. Transactions relating to future delivery of grain, in which the parties clearly do not intend delivery, and where possible delivery as a last resort would involve only a transfer of a warehouse certificate, would seem to be so far removed from any just notions of interstate commerce that no citation of authorities should be necessary, and yet we are not without authorities.
 

 A very clear authority on this subject is
 
 Ware & Leland
 
 v.
 
 Mobile County,
 
 209 U. S., 405, 28 S. Ct., 526, 52 L. Ed., 855, 14 Ann. Cas., 1031. This case involved the question of buying and selling futures. In that case Ware & Leland had offices in Mobile, Ala., and also had offices in New York City, New Orleans, and Chicago, and all contracts made in Mobile were placed in the cotton exchanges in the other cities. In all contracts it was stated that it was “understood and agreed in all trades that actual delivery is contemplated.” It being admitted that the contracts were purely speculative, upon the question of their interstate character the court said, at page 412 (28 S. Ct., 529):
 

 “For that part of the transactions, merely speculative and followed by no actual delivery, it cannot be fairly contended that such contracts are the subject of interstate commerce; and concerning
 
 *220
 
 such of the contracts for purchases for future delivery, as result in actual delivery of the grain or cotton, the stipulated facts show that when the orders transmitted are received in the foreign state the property is bought in that state and there held for the purchaser.”
 

 The court further observed:
 

 “He did not contract to ship it from one state to the place of delivery in another state. And though it is stipulated that shipments were made from Alabama to the foreign state in some instances, that was not because of any contractual obligation so to do. In neither class of contracts, for sale or purchase, was there necessarily any movement of commodities in interstate traffic, because of the contracts made by the brokers. ’ ’
 

 The court therefore reached the conclusion that the contracts were similar to insurance cases where the policies are ordered delivered in a state other than that of the residence and office of the company, and that they were not interstate commerce transactions.
 

 In
 
 Hammer, District Attorney,
 
 v.
 
 Dagenhart,
 
 247 U. S., 251, 38 S. Ct., 529, 62 L. Ed., 1101, 3 A. L. R., 649, Ann. Cas., 1918E, 724, the court had under consideration the Child Labor Act of September 1, 1916, (39 Stat., 675), which prohibited the transportation in interstate commerce of manufactured goods which were produced in violation of child labor regulations. It was held:
 

 “The grant of power to Congress over the subject of interstate commerce was to enable it to regulate such commerce, and not to give it authority to control the states in the exercise of the police power over local trade and manufacture.”
 

 
 *221
 
 The latest expression of the Supreme Court of the United States on this subject is found in
 
 Hill, Jr.,
 
 v.
 
 Wallace, Secy. of Agriculture,
 
 259 U. S., 44, at page 69, 42 S. Ct., 453, 458 (66 L. Ed., 822), wherein it is stated by Chief Justice Taft:
 

 “It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They cannot come within the regulatory power of Congress as such, unless they are regarded by Congress, from the evidence before it, as directly interfering with interstate commerce so as to be an obstruction or a burden thereon.”
 

 The same expression was again quoted by the Chief Justice in
 
 Board of Trade of City of Chicago
 
 v.
 
 Olsen, District Attorney,
 
 262 U. S., 1, 43 S. Ct., 470, 67 L. Ed., 839, at page 32 of the opinion (43 S. Ct., 476).
 

 Whether or not the Ohio penal statute forbidding transactions in futures is repugnant to the federal Grain Futures Act must in the last analysis depend upon the question whether the prohibition against making such contracts in the state of Ohio constitutes an obstruction to, and a direct burden upon, interstate commerce.
 

 This view is entirely consistent with the declarations of Section 3 of the Grain Futures Act, where Congress has sought to justify the act itself, and where it is stated that sudden and unreasonable fluctuations in prices, due to speculation, manipulation, and control, constitute an obstruction to, and a burden upon, interstate commerce in grain, and that regulation has therefore become imperative for the protection of such commerce and the national public interest therein. It is very clear,
 
 *222
 
 therefore, that not only the Supreme Court of the United States, hut Congress as well, have recognized the fact that Congress may not arbitrarily declare that to be interstate commerce which is not so in fact, but that, on the contrary, intrastate operations are recognized to be beyond the control of interstate agencies, except in so far as intrastate transactions obstruct and directly burden interstate commerce. In the Grain Futures Act Congress has not declared the necessity of promoting speculation in order to stabilize prices, but, on the contrary, has declared that speculation, manipulation, and control are calculated to promote sudden and unreasonable fluctuations in prices. "We find nothing in the act, therefore, to declare all transactions in grain to be interstate transactions, and we find nothing which even suggests the necessity of compelling all state agencies to cease their activities in the interest of unlimited speculation, manipulation, and control. If Congress in Section 3 has made any declarations which tend to approve dealings in futures, it is only those dealings whereby shippers, dealers, millers, and others engaged in handling grain and grain products in interstate commerce may hedge themselves against possible loss through fluctuations in price.
 

 It is sufficient in this connection to say that Horton was not the owner of 100,000 bushels of grain at the time he sold it short, and he was not seeking to hedge himself against price fluctuations. His contracts were in every sense wagering contracts. King & Co. likewise had no customer who desired to consume 100,000 bushels of grain; neither did they have any customer who expected to have that
 
 *223
 
 amount of grain or any grain delivered to Mm. King & Co. expected to profit by the rise or fall of the market.
 

 It is further claimed that by reason of the enactment of the Grain Futures Act the federal- government has occupied the field to the exclusion of all state agencies, and that the states are therefore forbidden to deal with the subject.
 

 It must be conceded that in certain matters Congress may establish a federal agency to regulate certain features of interstate commerce, to the exclusion of any agencies established by the state. An example of this is found in the provisions of the Boiler Inspection Act as last amended, wherein the Interstate Commerce Commission was invested with plenary power to prescribe the design, the construction, and the material of every part of a locomotive and tender employed in interstate commerce. That this act did give the Interstate Commerce Commission exclusive occupation of the field was recently held in the case of
 
 Napier, Atty. Gen.,
 
 v.
 
 Atl. Coast Line Bd. Co.,
 
 272 U. S., 605, 47 S. Ct., 207, decided by the Supreme Court of the United States November 29, 1926. This court recognized that authority, and followed the same in the recent case of
 
 Penna. Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 115 Ohio St., 733. On the other hand, there are certain other matters connected with interstate commerce regulations where the federal government clearly occupies the field concurrently with state agencies. In the matter of rate-making, while it is clear that schedules of rates between points within a state are subject to the regulation of the state commission, any orders made by the
 
 *224
 
 state commission must not be so unremunerative as to directly impose burdens upon interstate commerce. It is not necessary to enter into a discussion of this point. This court dealt with the subject at length, and pointed out the concurrent powers and the lines of demarcation between state and federal agencies in the case of
 
 Cincinnati & Northern Rd.
 
 Co. v.
 
 Public Utilities Commission,
 
 105 Ohio St., 553, 138 N. E., 74.
 

 Another example of concurrent occupation of the field is that of the enforcement of the Eighteenth Amendment. It is true that the Eighteenth Amendment provides that Congress, and the states as well, may enforce its provisions by appropriate legislation. This fact does not detract from the analogy of the prohibition amendment and statutes, because it has been repeatedly held by the Supreme Court of the United States that the intention of Congress to exclude the states from exercising their police power must be clearly manifested.
 
 Reid
 
 v.
 
 Colorado,
 
 187 U. S., 137, 148, 23 S. Ct., 92, 47 L. Ed., 108;
 
 Savage
 
 v.
 
 Jones, State Chemist of Indiana,
 
 225 U. S., 501, 533, 32 S. Ct., 715, 56 L. Ed., 1182.
 

 Nothing appears either expressly or impliedly in the Grain Futures Act to indicate an intention to exclude the states from enacting and enforcing legislation designed to prevent wagering contracts relating to grain. The Grain Futures Act is a regulation of boards of trade, and incidentally operates as a regulation of interstate commerce. The Ohio bucket shop statute is a penal statute, designed to guard the public morals, and to promote the common good, of the people of the sovereign
 
 *225
 
 state of Ohio. That the police power of the state has not been surrendered to the federal government, and that the state has power without violating any provisions of the federal Constitution to regulate the conduct of its citizens, has been more than once decided by the Supreme Court of the United States.
 

 The earliest case on this proposition is
 
 Cohens
 
 v.
 
 Virginia,
 
 19 U. S., (6 Wheat.), 264, 5 L. Ed., 257. In that case the question was whether a lottery licensed in the District of Columbia could operate in any state where the sale of lottery tickets was penalized by the laws of that state. It was unequivocally decided that the state law, enacted under the police power of the state to regulate the morals of its citizens, should prevail over the federal license. The opinion in this case was written by Chief Justice Marshall. To the same effect is the
 
 License Tax Cases,
 
 72 U. S. (5 Wall.), 462, 18 L. Ed., 497. The opinion of Chief Justice'Chase in that case contains a discussion of principles directly applicable to the instant case. A still later authority is the
 
 Lottery case,
 
 188 U. S., 321, 23 S. Ct., 321, 47 L. Ed., 492. The discussion of Mr. Justice Harlan at pages 356 and 357 of the opinion (23 S. Ct., 327) is especially applicable. Another and later ease on this subject is
 
 House
 
 v.
 
 Mayes, Marshal of Jackson Co., Mo.,
 
 219 U. S., 270, 31 S. Ct., 234, 55 L. Ed., 213, from the syllabus of which we quote:
 

 “The police power of the state, never having been surrendered by it to the federal government, is not granted by or derived from, but exists independently of, the federal Constitution.
 

 
 *226
 
 “One of the powers never surrendered by, and therefore remaining with, the state is to so regulate the relative rights and duties of all within its jurisdiction as to guard the public morals, safety and health, as well as to promote the public convenience and the common good.
 

 “It is within the power of the state to devise the means to be employed to the above ends provided they do not go beyond the necessities of the case, have some real and substantial relation to the object to be accomplished, and do not conflict with the Constitution of the United States.”
 

 That case involved the constitutionality of an act of the state of Missouri to prevent fraud in the purchase and sale of grain and other commodities. The opinion was written by Mr. Justice Harlan, and contains much which is applicable to the case at bar.
 

 In the case of
 
 Broadnax
 
 v.
 
 Missouri,
 
 219 U. S., 285, 31 S. Ct., 238, 55 L. Ed., 219, cited by counsel in the instant case, it is declared:
 

 “While it is the duty of the federal courts to protect federal rights from infringement, they should not strike down a police regulation of a state that does not clearly violate the federal Constitution; they cannot overthrow police legislation because they consider it unwise or inexpedient.”
 

 That opinion was also written by Mr. Justice Harlan, and the statutes under consideration in that case related to bucket shop transactions. Numerous other cases decided by the Supreme Court of the United States might be cited, but such citation is deemed unnecessary.
 

 
 *227
 
 In
 
 Ballmann
 
 v.
 
 United States,
 
 200 U. S., 186, 26 S. Ct., 212, 50 L. Ed., 433, the. bucket shop law of Ohio was under consideration, and the law was virtually held to be independent of interstate commerce regulations. In that case one Ballmann had been subpoenaed as a witness before a federal grand jury, and ordered to bring with him certain books pertaining to the operation of a bucket shop, and it was held that he would not be required to produce the books if he claimed that his testimony would tend to incriminate him.
 

 In all of the cases where the Supreme Court of the United States, on the ground of alleged interference with interstate commerce by the state, has limited or prohibited action by state agencies, its judgments have been placed upon the ground of direct obstructions to, and burdens upon, interstate commerce, and that court has steadfastly refused to act where the alleged interference was only incidental. In the instant case, the argument of counsel in its last analysis contends that stabilization of the grain markets requires dealing in futures: that this has been so declared by Congress; and that any restrictions upon such dealing within any state by any state legislature, prohibiting or penalizing the same, is repugnant to the Grain Futures Act. If this argument is sustained, it results that there are no prohibitions upon dealing in futures in grain in any state in the Union so long as one of the parties to such contracts maintains a form of contract with a board of trade located in a contract market. One answer to this argument is that Congress has not by express terms occupied the field of authorizing speculation in grain either concur
 
 *228
 
 rently with, or to the exclusion of, state agencies, and a further answer is that the congressional legislation is not repugnant to the Ohio Bucket Shop Act. On the contrary, both acts have declared that speculation and manipulation cause sudden and unreasonable fluctuations in price, and the federal act is designed to limit, while the state act is designed to prohibit, speculation in futures altogether where the contracts are made within the geographical limits of the state. The state of Ohio does not prohibit all speculation in grain. It only requires that such speculation shall be limited by the visible supply of grain and the possibility of making delivery, and a conviction of a violation can only be obtained where it is shown that there was no intention to deliver. To say that such a limitation upon transactions in grain is such an obstruction to legitimate transactions in grain in interstate commerce as to impose a direct burden thereon is to state a self-evident absurdity.
 

 A discussion of principles having some bearing upon the instant case will be found in
 
 Columbus Packing Co.
 
 v.
 
 State, ex rel. Schlesinger, Pros. Atty.,
 
 100 Ohio St., 285, 126 N. E., 291, 29 A. L. R., 1429, at page 299 of the opinion (126 N. E., 295). Counsel have cited the recent case of
 
 Board of Trade
 
 v.
 
 Gentry,
 
 in the District Court of the United States for the state of Missouri, in which the District Court held that Congress, in the enactment of the Grain Futures Act, has entered and appropriated the entire field to itself. On the other hand, we find the case of
 
 Fenner
 
 v.
 
 Boykin,
 
 decided by the district court of Georgia, January 22, 1925, reported in 3 F. (2d), 674. In that case, involving
 
 *229
 
 the same principles discussed in the instant case, the court took a wholly different view of the matter from the Missouri district court, and held:
 

 “The taking of orders in one state for the purchase or sale of a commodity on an exchange in another state, where the contracts are made and to be executed, does not constitute ‘interstate commerce.’ ”
 

 It was further held in that case that prohibiting and penalizing contracts for future delivery, where margins are deposited, is an exercise of the police power of the state. In the opinion the court discussed
 
 Hill, Jr.,
 
 v.
 
 Wallace, supra,
 
 and
 
 Board of Trade of City of Chicago
 
 v.
 
 Olsen, supra,
 
 and reached the conclusion that they did not apply, because the prohibited transactions did not constitute interstate commerce. We have also carefully examined the case of
 
 State, ex rel. Burnett,
 
 v.
 
 Rosenbaum Grain Co.,
 
 decided by the Supreme Court of Kansas, reported in 115 Kan., 40, 222 P., 80. The Kansas Supreme Court reached conclusions with which we are wholly unable to agree.
 

 Counsel rely upon the case of
 
 Board of Trade
 
 v.
 
 Olsen, supra,
 
 as supporting their contentions in this case, but we have examined that authority in vain to find any such support. That case was brought by the Chicago Board of Trade to enjoin any regulation of the Board of Trade, on the ground that the board was not engaged in interstate commerce, and on the further ground that it was a private corporation, and not subject to regulation as provided in the Grain Futures Act. The Supreme Court of the United States only decided the case before it, and held that the members of the Board of Trade
 
 *230
 
 were dealing in a subject of interstate commerce in such manner as to justify federal regulation.
 

 For all the foregoing reasons, the judgment of tbe trial court and of the Court of Appeals must be affirmed.
 

 Judgment affirmed.
 

 Day, Allen, Kinkade, Robinson and Matthias, JJ., concur.
 

 Jones, J., dissents.