**THERMICE CORPORATION**

v.

**VISTRON CORPORATION and Airco, Inc.**

**Civ. A. No. 79–2229.**

United States District Court, E. D. Pennsylvania.

Dec. 18, 1981.

---

**52.** *Id.*

Joel Harris, Weil, Gotshal & Manges, New York City, Franklin Poul, Wolf, Block, Schorr & Solis Cohen, Philadelphia, Pa., for plaintiff.

Larrick B. Stapleton, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Vistron.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Airco.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiff, Thermice Corporation (Thermice), brought this action against defendants, Airco, Inc. (Airco), and Vistron Corporation (Vistron), seeking damages, injunctive and declaratory relief for violations of sections 1 and 2 of the Sherman Act, tortious interference with contract, and breach of contract based upon contracts for the sale of $CO_2$ between Vistron and Thermice and between Vistron and Airco. Airco then filed a counterclaim in which it alleged that Thermice had tortiously interfered with its contractual relations with Vistron. The action was tried without a jury for 6 days from November 30 to December 7, 1981. By the second day of trial Airco and Thermice had settled all claims between them in this litigation, and Thermice voluntarily dismissed with prejudice its remaining claims with the exception of its breach of contract claim as to Vistron. The trial, which had been bifurcated, proceeded solely on the question of whether Vistron had breached its contractual obligations to Thermice. On the basis of the evidence presented at trial, the Court has found that Thermice failed to carry its burden of proving that Vistron breached the contract and will enter judgment for Vistron and against Thermice.

I. *Parties*

Plaintiff Thermice is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania and is a wholly-owned subsidiary of Publicker Industries, Inc. Thermice is engaged in the manufacture and the wholesale and retail distribution of liquid and solid carbon dioxide ($CO_2$).

The sole manufacturing facility owned by Thermice currently producing $CO_2$ is located in Muscatine, Iowa. The remainder of the $CO_2$ distributed by Thermice is purchased from Vistron, which operates a liquefaction plant in Lima, Ohio; Koch Chemical Company, which operates a liquefaction plant near St. Paul, Minnesota; and, occasionally, on a "spot" or "swap" basis from its competitors.

Vistron is an Ohio corporation with its principal place of business in Cleveland, Ohio and is a wholly-owned subsidiary of Standard Oil Company of Ohio (Sohio). Vistron, then known as Sohio Chemical, was formed in 1955 for the purpose of manufacturing nitrogen compounds for industrial and agricultural uses. In 1956, Vistron constructed a $CO_2$ plant in Lima, Ohio to purify and liquefy the raw $CO_2$ gas which is a by-product of the company's ammonio facility. In 1971, Vistron completed a new complex in Lima, which included ammonia, urea, and carbon dioxide facilities.

Since 1971, Vistron has sold the bulk of its liquid $CO_2$ by-product to Thermice and Airco under long term contracts. Vistron also has made incidental and occasional sales of excess carbon dioxide to Liquid Carbonic Corporation, which sales ceased after May 1978 and are not material to this lawsuit. On occasion, Vistron has also used small portions of its liquid $CO_2$ production for internal purposes at its Lima plant; such uses also are not material to this litigation.

Airco is a Delaware corporation with its principal place of business in Montvale, New Jersey and is engaged in, among other things, the manufacture and distribution of liquid $CO_2$. Although originally named as a defendant in this action, the claims and counterclaims asserted by and between Thermice and Airco have been resolved as a result of a settlement agreement entered into by Thermice and Airco during the course of trial.

II. *General Facts Relating to the $CO_2$ Industry*

Liquid $CO_2$ is produced by purifying and liquefying raw $CO_2$ gas, which is given off

as a by-product of a number of industrial processes including the manufacture of ammonia. Solid $CO_2$, or "dry ice", is produced by expanding liquid $CO_2$. Liquid $CO_2$ and solid $CO_2$ are each totally fungible. Although both liquid and solid $CO_2$ are involved in the contracts discussed in this memorandum, solid $CO_2$ has constituted a relatively minor part of the production of Vistron and its sales to Thermice.

The demand for $CO_2$ varies greatly with the seasons, the greatest demand occurring in the summer months when the product is in high demand by soft drink manufacturers. However, because the raw $CO_2$ gas used in the production of liquid $CO_2$ is a by-product of the manufacture of other unrelated products, the supply varies in accordance with the demand for these main products rather than in accordance with the demand for $CO_2$ itself. Plant shutdowns and periods of restricted operations at various $CO_2$ facilities, conditions beyond the control of the $CO_2$ distributors drawing $CO_2$ from such facilities, help reduce the total supply of $CO_2$ available to the industry in the summer months. In addition, the limited storage life and high transportation costs for liquid and solid $CO_2$ tend to make it impractical to transport $CO_2$ over long distances. As a result, it is important for distributors to make provisions for a continuous supply of $CO_2$ within reasonable distance of their market area in order to meet their customers' requirements during periods of high demand when the product is in short supply.

### III. *The 1970 Contracts*

On July 20, 1970, Airco and Vistron entered into a contract for the purchase by Airco of solid and liquid $CO_2$ to be produced at the Lima facility. The period of the contract was to commence upon the first shipment of $CO_2$ to Airco and was to end on April 30, 1986. The contract provided for the sale of 84,500 tons of $CO_2$ to Airco during the first contract year and for increasing annual commitments with a maximum commitment of 117,000 tons in the fifth year of the contract and all ensuing years. Paragraph 6(a) of the contract provided for a "take or pay" penalty in the event Airco should not purchase at least 75% of the annual quantity Vistron was required to make available to Airco. The contract also required Vistron to make available to Airco a maximum of 450 tons of $CO_2$ per day.

Paragraph 10 of the contract contained the following "allocation" clause:

*Allocation*: AIRCO understands that VISTRON has concurrent contracts to supply liquid and solid Product [$CO_2$] from the Facility [the Lima facility]. In accordance with these commitments and irrespective of any other provision hereof, VISTRON will apportion to AIRCO sixty-nine [69] percent of the available supply of liquid products.

"Allocation", as used in Vistron contracts, refers to those times when Vistron does not produce or maintain in storage sufficient $CO_2$ to meet the current demands of its customers. During these allocation periods, the limited amount of available $CO_2$ being produced by Vistron is apportioned among Vistron's customers, as provided in their respective contracts with Vistron maintaining the right to declare when its plant will go on allocation. Allocation generally occurs when the demand for $CO_2$ exceeds available supply, during frequent mechanical shutdowns that characterize $CO_2$ production, or when there is a reduced demand for production of the primary product, the manufacture of which results in the $CO_2$ by-product.

Vistron also entered into a contract for the sale of liquid and solid $CO_2$ with Thermice on October 8, 1970. The contract was to run for a period of ten years plus an additional five years thereafter, unless cancelled in writing by either party. Under the provisions of the contract Vistron was to make available to Thermice a maximum of 180 tons of $CO_2$ per day and minimum annual quantities ranging from 25,000 tons in the first year to 50,000 tons in the fourth contract year and each year thereafter. Paragraph 5 also provided that if Thermice should in the future require additional an-

nual tonnage, Vistron would make every effort to meet Thermice's needs. On the other hand, paragraph 14(c) of the contract limited Vistron's weekly obligation to provide $CO_2$ to Thermice to an average of 180 tons of product per day.

The Thermice-Vistron contract also contained a take or pay provision requiring Thermice to pay a penalty if it failed to take 80% of its annual commitment. The proposed contract also contained an allocation clause which originally provided:

10. *Allocation*: THERMICE understands that VISTRON has concurrent contracts to supply liquid and solid carbon dioxide from the Facility to THERMICE and others. In accordance with these commitments, VISTRON will:

a. Apportion the available supply of liquid carbon dioxide to each contract customer and THERMICE in direct proportion with their purchases or use in the proceeding [sic] ten [10] days.

At the time of the execution of the contract, October 8, 1970, the parties executed an addendum which deleted subparagraph (a) of paragraph 10 and replaced it with the following language:

a. Apportion the available supply of liquid carbon dioxide to each contract customer as of the date of the execution of this CONTRACT in direct proportion to its minimum commitment as outlined in paragraph 5. *Quantities.*

This addendum was executed because Thermice was told by Vistron that the proposed provision created the possibility of a conflict with the allocation provision of Vistron's other supply contract. Thermice understood that the other contract was with Airco. (On the basis of the figures set forth in the Airco and Thermice contracts for annual commitments, it appears that Thermice, under the terms of the addendum, would not be entitled to more than 30% of the $CO_2$ during allocation periods, thus preventing any conflict with the 69% allocation provisions in the Airco contract).

Following the execution of their contracts, no significant problems or disputes arose between Vistron and Thermice. During allocation periods the available $CO_2$ was generally apportioned on a 69/31% basis between Airco and Thermice. The result of this fixed apportionment was to subject Thermice to greater disparities between the amount of $CO_2$ required to supply its customers and the amount of $CO_2$ available from Vistron during allocation periods, as Thermice's business expanded. Although Thermice would have preferred more $CO_2$ during allocation periods, they understood the general nature of the limitations placed upon the availability of $CO_2$ from Vistron, as well as upon their own contractual rights, by the Airco-Vistron contract. Thermice, however, was not aware of the specific provisions of the Airco contract at that time.

## IV. *The 1977 Amendments*

By 1976, increased production costs, as well as significant increases in the market price for $CO_2$, had rendered Vistron's contracts with Airco and Thermice less than profitable to Vistron and it resolved to attempt to renegotiate the price provisions of its two long-term supply contracts and contacted Airco in May 1976 for this purpose. Vistron did not receive a warm reception from Airco because during the first six years of the contract Airco had repeatedly failed to purchase the minimum amounts of $CO_2$ set forth in the "take or pay" provisions of its contract and had been required to pay substantial penalties to Vistron. Vistron now wished to alter the price provisions of Airco's contract and to reduce the allocation and quantity provisions of the contract in order to correspond more realistically to Airco's requirements. Airco, however, wished to maintain the current levels of the quantity provisions in its contract and to reduce the minimum requirement provisions of its "take or pay" provisions. Lengthy and often divisive negotiations ensued during which Vistron, by formal notices dated February 3, 1977 and April 1, 1977, threatened cancellation of the contract with Airco. Finally, in late April 1977, Vistron and Airco reached agreement on an amendment to the 1970 Airco con-

tract, which amendment was made effective retroactively to January 1, 1977. This amendment made no change in the 69% allocation provision of the 1970 contract.

During the course of its negotiations with Airco, Vistron approached Thermice and expressed its desire to renegotiate the price provisions of their 1970 contract. In late October 1976, Donald R. Brinkley, Vice-President of Chemicals and Plastics for Sohio, Vistron's parent corporation, and John Robert Neeley, Manager of Industrial Sales for Sohio, met with Robert B. Richards, Executive Vice-President of Thermice in Philadelphia to discuss the possibility of amending their 1970 contract. Thermice expressed a willingness to renegotiate the price provisions of the contract provided Vistron would agree to amend the contract to provide for additional daily and annual quantities of $CO_2$, additional $CO_2$ during periods of allocation, and additional storage facilities for Thermice at Lima. Over the course of subsequent meetings and phone calls, Thermice and Vistron were able to reach agreement on all aspects of the amendment except the revision of the allocation clause contained in the contract. Both parties understood that no such revision was possible until the quantities provisions of the Airco-Vistron amendment were finalized.

Initially, Mr. Richards of Thermice was told that Vistron might cancel the Airco contract and be willing to sell all the $CO_2$ produced at the Lima facility to Thermice. Approximately two weeks later, however, Mr. Richards was told that this was no longer a possibility because Airco and Vistron had renewed negotiations. Mr. Richards was told, however, that Vistron was confident that it could arrange to increase the amount of $CO_2$ supplied to Thermice because of Airco's consistent failure to purchase its full allotted share of $CO_2$ and Vistron's intention to attempt to reduce the quantity provisions of the Airco contract to correspond more realistically to Airco's take.

On or about May 13, 1977, after Airco and Vistron had reached agreement on the revision of their 1970 contract, John F. Murray, Vice-President of Marketing for Nitrogen and Chemicals for Vistron, met with Mr. Richards in Cleveland. At this time, Mr. Murray showed Mr. Richards the page of the Airco-Vistron contract containing the 69% allocation provision in order that Mr. Richards could fully understand the inherent problems of drafting a new Thermice allocation clause which would not conflict with the Airco contract. Mr. Murray continued to express his confidence that Vistron would be able to fill Thermice's needs during periods of allocation by: supplying Thermice with the excess $CO_2$ which Airco did not purchase; by providing additional storage for Thermice at Lima; and, by switching to a seven day-a-week loading schedule for Thermice. Mr. Richards, however, was concerned about his ability to get his company's approval for a price increase without first obtaining a change in the allocation clause. Mr. Richards had earlier suggested a return to the original language of paragraph 10(a) (the allocation language rejected by Vistron in 1970) which apportioned the available supply of $CO_2$ to each customer in direct proportion with their purchase of $CO_2$ in the preceding ten days. Mr. Murray, however, rejected this language because he believed it would conflict with the Airco allocation clause.

After continued negotiations and numerous phone calls, Thermice and Vistron executed an amendment to their 1970 contract in July 1977, which was effective as of January 1, 1977 and extended the contract period to December 30, 1990. Pursuant to this amendment, Vistron received a price increase of approximately $3.50 per ton of $CO_2$. In return, Thermice's annual commitment of 50,000 tons was increased by 50% to 75,000 tons for 1977 and all ensuing years of the contract. Vistron's maximum daily delivery obligation was also increased by 50% from 180 tons to 270 tons. Although Thermice had originally requested a corresponding change in the weekly maximum set forth in paragraph 14(c), this paragraph was not amended. The amended contract also required Vistron to build and make available to Thermice for a nominal rental,

additional storage facilities at Lima having a storage capacity of 1800 tons. These additional facilities were built by Vistron at a cost of $575,000 and were leased to Thermice for $100 per month. Although not expressed in the amended contract, Vistron also agreed to load $CO_2$ for Thermice on a seven day per week basis (Airco vehicles were only loaded five days per week).

In addition to the above changes, subsection (a) of the allocation clause set forth at paragraph 10 was replaced by a new clause which provided:

> a. The available supply of liquid carbon dioxide will be apportioned by VISTRON to each contract customer based on its annual individual commitments and adjusted for recent actual taking by each such customer against its individual commitment.

The introductory language of paragraph 10 remained unchanged. It is this amendment to the allocation clause which precipitated the present litigation.

### V. *Performance Under the 1977 Contract Amendments*

Although Vistron and Thermice agreed on the language which replaced the prior paragraph 10(a), none of the individuals responsible for the negotiation and implementation of the provision knew exactly how it was to be applied. For example, Mr. Richards testified that he initially did not know what "recent actual taking" meant, but that he was satisfied with the language after discussing it with Thermice's attorneys. He then stated that he understood the provision to mean that $CO_2$ would be apportioned during allocation on the basis of the customer's recent actual consumption or purchase of $CO_2$ during the most recent "non-allocation" period, although he admitted that he didn't know the length of the period that would be used. Similarly, the testimony of Messrs. Murray, Neeley, Brinkley and Dietz (base area superintendent at Vistron's Lima facility responsible for the operation of the ammonia plant) of Vistron, as well as the testimony of Mr. Brennan of Thermice, revealed that none of them had a clear perception of how the

provision would be implemented or what period would be used to determine "recent actual taking."

The first application of the clause occurred in April 1978 when the Vistron plant went on allocation. As per their usual custom, Vistron notified Airco and Thermice that the plant was going on allocation and informed each customer of the amount of daily product which would be available to them. Mr. Richards believed that the amount communicated to Thermice did not reflect their recent level of purchasing in accordance with the new contract provision and had Mr. Brennan call Vistron for an explanation. After receiving Mr. Brennan's call at the Lima facility, Mr. Dietz called Mr. Neeley and Mr. Murray at Vistron's headquarters in Cleveland for instructions. Mr. Dietz was told to apportion the $CO_2$ during allocation on the basis of the new "recent take" provision. Although the exact period used to calculate the "recent take" of each customer was never definitively established, it appears that Vistron personnel added up the total shipments sent to Airco and Vistron during the course of the preceding thirty or more days of the most recent non-allocation period and then determined the percentage of total shipments to Thermice. This percentage was then used to determine the amount of daily product to be shipped to Thermice. This method of calculation resulted in a greater allocation of $CO_2$ to Thermice in April 1978 and Mr. Brennan, although still unsure of the method of calculation and the correctness of the exact amount allocated, was satisfied with the amount of product supplied to Thermice.

Vistron continued to employ the "recent take" formula from April 1978 to May of 1979. During this period Thermice altered its business methods in an attempt to procure customers who would buy large quantities of $CO_2$ during non-peak seasons in order to increase Thermice's take in non-allocation periods. Thermice desired to increase its take in non-allocation periods in order to obtain greater quantities of $CO_2$ in allocation periods. Thus, Thermice began

making wholesale sales (where the customer pays Thermice but picks the product up at Vistron's facility) to Liquid Air and Air Products, companies which competed with Thermice in certain areas of the $CO_2$ market. Thermice also sold large quantities of $CO_2$ to Penzoil for use in secondary oil recovery. As a result of these efforts Thermice built its percentage take of $CO_2$ during subsequent periods of allocation to a high of 55.3%.

During the period following April 1978, Thermice's increased take of $CO_2$ during allocation periods had the inevitable result of reducing Airco's percentage of $CO_2$ during allocation periods. During this period Airco did not question the amount of $CO_2$ being made available to it, apparently because the amount apportioned was sufficient to meet its needs and because the amount of available $CO_2$ was being communicated to Airco in terms of the tons available without mention of the percentage of production the allocated tonnage represented.

In May 1979, however, things changed. Airco was experiencing low inventory levels and was notified by Vistron that an allocation period was about to begin. When Airco was told the amount of $CO_2$ available for its use Airco apparently became aware that the allocated amount did not represent 69% of Vistron's production and demanded its full 69% share. Meanwhile, Thermice, applying a recent take formula, was demanding 55.3% of Vistron's allocation production.

In response to this situation Larry Walth, the new Vistron person responsible for carbon dioxide, met with Airco personnel in New Jersey and told them that Vistron was having a conflict with another purchaser and asked whether Airco could be flexible with regard to its demand for 69%. Airco continued to demand the 69% as provided in its contract and on May 17, 1979 Vistron, after consulting its legal department, apportioned the $CO_2$ on a 69/31% basis between Airco and Thermice. Thermice immediately protested.

Since May 1979, with the exception of the period from June 28 to July 18, 1979 when a temporary restraining order entered in this action required Vistron to allocate on a 50–50 basis, Vistron has apportioned to Thermice, during periods of allocation, various percentages of its $CO_2$ production which have generally fallen between 31% and 40%.

### VI. *Procedural History*

On June 19, 1979 Thermice filed a complaint naming Airco and Vistron as defendants. The complaint set forth five causes of action: (1) a breach of contract claim against Vistron; (2) a claim of tortious interference with contract against Airco; (3) a claim for treble damages and injunctive relief against Airco and Vistron under sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15, based on alleged violations of sections 1 and 2 of the Sherman Act; (4) a claim for treble damages and injunctive relief against Airco for violations of section 2 of the Sherman Act; and (5) a request for declaration pursuant to 28 U.S.C. § 2201 that the Airco-Vistron contract was void because it violated two consent decrees.

On June 27, 1979, this Court issued a temporary restraining order requiring Vistron to allocate its $CO_2$ production to Thermice and Airco on a 50/50 basis. The order was in effect, by agreement of the parties, from June 28, 1979 until July 18, 1979, at which time this Court, after a hearing on Thermice's motion for a preliminary injunction, denied Thermice's request for a preliminary injunction which would have enjoined Vistron from complying with the 69% allocation clause in the Airco agreement. As set forth in this Court's July 18, 1979 memorandum, Thermice's request for a preliminary injunction was denied because of its failure to establish irreparable harm.

Additionally, the Court notes that Thermice filed a related action in April 1981, *Thermice Corporation v. Vistron Corporation*, Civil Action No. 81–1731, when Vistron sent Thermice notice that they were canceling their contract because of Thermice's failure to pay for its shipments of $CO_2$ within the time prescribed in the contract. On April 28, 1981 this Court entered a tem-

porary restraining order requiring Vistron to resume supplying $CO_2$ to Thermice in accordance with their contract. The order remained in effect until May 15, 1981 at which time this Court, after a hearing for injunctive relief which was consolidated with trial on the merits, entered an order enjoining Vistron to supply $CO_2$ to Thermice pursuant to the terms of their contract until the termination date set forth in the contract, or until the contract has been cancelled or otherwise terminated in accordance with its provisions or until further order of this Court. As set forth in this Court's memorandum dated May 19, 1981, the Court's order was based on its determination that Vistron's cancellation of the contract was invalid because it failed to comply with the provisions of the contract requiring 30 days notice of cancellation.

On September 8, 1981, defendant Airco moved for summary judgment on counts 2, 3 and 5 of the complaint alleging tortious interference, Sherman Act section 1 violations, and a claim for declaratory relief. Thermice responded with a cross-motion for summary judgment on its claim for declaratory relief set forth in count 5 of the complaint. On November 30, 1981, the Court denied Thermice's motion for summary judgment and granted Airco's motion, insofar as it related to count 5, by dismissing count 5 of the complaint wherein Thermice sought declaratory relief. In addition, the Court denied Airco's motions for summary judgment as to count 2 of the complaint alleging tortious interference and count 3 alleging Sherman Act violations on the ground that there existed genuine issues of material facts.

Early in the trial, as a result of a settlement with Airco, Thermice dismissed with prejudice all of its remaining claims except for the breach of contract claim against Vistron set forth in count 1 of the complaint. Thus the only issue remaining for determination in this non-jury trial is whether Vistron has breached its contractual obligations to Thermice.

## VII. *Thermice's Breach of Contract Claim*

The issue now before the Court is whether Vistron's apportionment of 31% of its supply of $CO_2$ to Thermice during the allocation period commencing on May 17, 1979 and its subsequent apportionments of $CO_2$ during periods of allocation violated the allocation clause contained in paragraph 10 of Thermice's 1977 amended contract. As heretofore stated, paragraph 10, as amended, reads as follows:

10. *Allocation* : THERMICE understands that VISTRON has concurrent contracts to supply liquid and solid carbon dioxide from the Facility to THERM-ICE and others. In accordance with these commitments, VISTRON will:

   a. The available supply of liquid carbon dioxide will be apportioned by VISTRON to each contract customer based on its annual individual commitments as a percent of total commitments and adjusted for recent actual taking by each such customer against its individual commitment.

Thermice claims that paragraph 10 requires Vistron to apportion its $CO_2$ production during allocation periods solely on the basis of each customer's recent take of $CO_2$ during the most recent non-allocation period. Using the recent take formula, which Vistron appears to have applied from April 1978 to May 1979, Thermice would have been entitled to 55.3% of Vistron's output during the allocation period beginning in May of 1979. Thermice claims that Vistron's apportionment of only 31% of its output during the May allocation period and its failure to apportion its supply of $CO_2$ in accordance with a recent take formula during subsequent allocation periods constituted a breach of its obligations under paragraph 10.

Vistron, on the other hand, claims that paragraph 10 does not require a strict application of a recent take formula in all situations. Instead, Vistron claims that the recent take language of subsection (a) of paragraph 10 must be read in conjunction with the language of paragraph 10 which precedes subsection (a) and which states

that "THERMICE understands that VISTRON has concurrent contracts to supply liquid and solid carbon dioxide ... to THERMICE and others. In accordance with these commitments, VISTRON will ...." Vistron claims that the purpose and effect of this provision was to make application of a recent take formula subject to Airco's contractual right to demand 69% of Vistron's $CO_2$ production during periods of allocation of its $CO_2$ production. Thus Vistron claims that its allocation of 31% to Thermice in May 1979, when Airco demanded its full 69% allocation share, did not breach paragraph 10 of the amended contract.

Although the issue as to whether the law of Ohio or Pennsylvania should be applied has not been briefed by the parties, the Court finds it unnecessary to make such a determination in this case since there appears to be no difference in the law of these two states applicable to the facts of this case.

■ In determining whether Vistron's actions constituted a breach of the terms of the amended complaint, we begin with the basic rules of contract interpretation. When parties to an agreement reduce their understanding to a writing that uses clear and unambiguous terms, a court should look no further than the writing itself when asked to give effect to that understanding. *Brokers Title Co., Inc. v. St. Paul Fire & Marine Insurance Co.*, 610 F.2d 1174, 1178 (3d Cir. 1979); *Tuskegee Alumni Housing Foundation, Inc. v. National Homes Construction Corp.*, 450 F.Supp. 714 (S.D.Ohio 1978), aff'd, 624 F.2d 1101 (6th Cir.). If, however, the terms of the contract are ambiguous the Court must attempt to ascertain the intent of the parties and to construe the ambiguous terms in a manner consistent with their intent. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979); *Stony's Trucking Co. v. Public Utilities Commission*, 32 Ohio St.2d 139, 290 N.E.2d 565, 568 (1972).

■ A contract provision is ambiguous when it is susceptible to two or more reasonable interpretations. *American Druggists Insurance Co. v. Equifax, Inc.*, 505 F.Supp. 66, 68 (S.D.Ohio 1980); *Disanto v. Enstrom Helicopter Corporation*, 489 F.Supp. 1352, 1359 (E.D.Pa.1980). Such is the case here. The language of paragraph 10 speaks of Thermice's understanding of Vistron's concurrent contracts to supply $CO_2$ to Thermice and others, and in accordance with those commitments, apportionment based on Vistron's annual individual commitments as a percentage of total commitments and an adjustment by Vistron for recent actual taking by each customer against its individual commitment. This language is totally unclear. If one attributes meaning to each of the words and phrases in paragraph 10 the Court finds that the allocation formula as expressed on the face of the contract is ambiguous. In addition, the Court finds that this ambiguity cannot be resolved nor can the parties' intent with respect to paragraph 10 be inferred, from the remaining provisions of the contract. Thermice claims that paragraph 10 requires Vistron to apportion the available $CO_2$ during allocation periods solely on the basis of recent take. Vistron, on the other hand, claims that paragraph 10 requires apportionment during periods of allocation on the basis of recent take subject, however, to Airco's contractual right to demand 69% of Vistron's output during allocation periods.

■ In construing the meaning of an ambiguous contractual provision the Court should look to the meaning which the parties have accorded to it as evidenced by their conduct in its performance. *Capitol Bus Company v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556, 560 (3d Cir. 1973); *Pavlik v. Consolidated Coal Co., Inc.*, 456 F.2d 378, 381 (6th Cir. 1972). In this case, however, the parties' conduct provides little aid in resolving the ambiguity. As heretofore stated, Vistron applied a recent take formula during allocation periods from April 1978 to May 1979. While Vistron's repeated use of a recent take formula is consistent with Thermice's interpretation of paragraph 10, it is not inconsistent with Vistron's interpretation which also provides for apportion-

ment during allocation periods on the basis of a recent take formula except where it would conflict with Airco's right to take 69% of Vistron's production during allocation periods. Since Airco did not insist on its full 69% during the periods in which Vistron applied a recent take formula, Vistron's conduct during those periods does not aid the Court in determining the interpretation to be given to paragraph 10.

■■ In instances such as this where the meaning of a contractual provision is not clear from the face of the contract or is capable of more than one reasonable interpretation, the Court may look beyond the four corners of the contract and consider extrinsic evidence regarding the negotiations and circumstances surrounding the making of the contract in order to glean the parties' intent. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d at 1271; *Stony's Trucking Co. v. Public Utilities Commission*, 290 N.E.2d at 568; *Ferguson v. Sharkey Construction Co.*, 137 N.E.2d 525, 527 (Ohio App.1956). As heretofore stated, the Court has found: that in the course of the negotiations of the amended contract, Mr. Murray showed the Airco allocation clause to Mr. Richards for the purpose of making him aware of the difficulty of designing a new allocation provision for Thermice that would result in more $CO_2$ for Thermice during allocation periods without conflicting with the Airco allocation clause; that both parties were aware that Airco repeatedly failed to purchase all of its 69% allocation share; that Vistron twice rejected an allocation clause because Vistron feared that it would conflict with Airco's allocation rights; and, that Vistron would not write a new allocation provision for Thermice until the quantity provisions in the Airco agreement were finalized. In light of these findings, which are based upon the credible evidence submitted at trial, the Court finds that at the time the amended contract was negotiated the parties did not intend the amended allocation clause to conflict with Airco's right to purchase up to 69% of Vistron's $CO_2$ output during allocation periods. Accordingly, we find that amended paragraph 10 requires

application of a recent take formula in determining the apportionment of $CO_2$ during allocation periods subject, however, to Airco's right to demand and receive 69% of Vistron's output during allocation periods.

■ The Court is compelled to reject Thermice's interpretation of paragraph 10 for another reason—under the facts as found by the Court such an interpretation would render the contract, or at least the allocation clause, illegal. It is a generally accepted precept of contract law that where two parties knowingly enter into a contract contemplating the breach of the contractual rights of a third party, such a contract is illegal and unenforceable. *Diversified Utilities Sales, Inc. v. Monte Fusco Excavating Contracting Company, Inc.*, 71 F.R.D. 661, 664 (E.D.Pa.1976); Restatement of Contracts § 576 (1932); 15 Williston on Contracts § 1738 (3d ed. 1972). If, as Thermice asserts, the allocation clause requires Vistron to apportion its $CO_2$ production solely on the basis of recent take, a situation inevitably would arise where an apportionment in accordance with a recent take formula would require Vistron to breach its contract with Airco. Since this Court has already determined that both parties were aware of the provisions of the allocation clause in the contract between Airco and Vistron, acceptance of Thermice's interpretation of paragraph 10 would require this Court to find that the parties knowingly entered into a contract which they knew would induce a breach of Airco's contract and such a finding would render the contract, or at least its allocation provision, illegal and unenforceable. *See generally, C. A. King & Co. v. Horton*, 116 Ohio St. 205, 156 N.E. 124 (S.Ct. Ohio 1927), *error dismissed*, 276 U.S. 600, 48 S.Ct. 322, 72 L.Ed. 725 (Court has the right to develop evidence and charge on illegality of contract although neither party asserted illegality.) In situations such as this where a contract provision is subject to two interpretations one of which will render the contract illegal and one which will sustain the validity of the contract, the Court will adopt the latter if it is reasonable. *Cordovan Associates,*

*Inc. v. Dayton Rubber Company*, 290 F.2d 858, 861 (6th Cir. 1961); *Schellentrager v. Tradesmens National Bank & Trust Co.*, 370 Pa. 501, 88 A.2d 773, 775 (1952); *Rothstein v. Jefferson Ice Manufacturing Co.*, 137 Pa. Super. 298, 9 A.2d 149, 153 (1939).

██ In addition, the Court's determination that paragraph 10 provides for allocation on the basis of recent take to the extent that the apportionment is compatible with Airco's contractual rights is also in accord with the rule of construction which states that a Court should attempt to give meaning to every part of a contract and should attempt to read all provisions as being compatible whenever possible. *See Treasure Craft Jewelers, Inc. v. Jefferson Insurance Co.*, 431 F.Supp. 1160 (E.D.Pa. 1977), *aff'd*, 583 F.2d 650 (1978). Here, Thermice's interpretation would require the Court to ignore that portion of paragraph 10 which provides that "THERMICE understands that VISTRON has concurrent contracts to supply liquid and solid carbon dioxide from the Facility to THERMICE and others. In accordance with the commitments, VISTRON will . . ."

██ The only remaining question is whether Vistron breached paragraph 10 of its contract with Thermice. The burden of proving by a preponderance of the evidence that such a breach occurred rested with plaintiff. Thermice proved only that during the periods in question Vistron apportioned a smaller percentage of its allocation output of $CO_2$ to Thermice on the ground that Airco had demanded its right to take up to 69% of Vistron's allocated output. These actions on the part of Vistron did not constitute a breach of paragraph 10. Therefore, the Court finds that Thermice has failed to prove by á preponderance of the evidence that Vistron breached the provisions of the 1970 Thermice agreement as amended in 1977 and Thermice is not entitled to damages or injunctive relief. This memorandum is in lieu of findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a). An appropriate order will accordingly be entered.