**JOEL POPKIN AND CO., Plaintiff,**

v.

**WHARTON ECONOMETRIC FORECASTING ASSOCIATES, INC., et al., Defendants.**

**Civ. A. No. 84–2796.**

United States District Court, District of Columbia.

Feb. 19, 1987.

Walter H. Fleischer, Washington, D.C., for plaintiff.

Joel A. Adler, Washington, D.C., for defendants.

STANLEY S. HARRIS, District Judge.

## MEMORANDUM OPINION

This matter is before the Court on plaintiff's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 as to Count One of the complaint, and for an entry of final judgment as to Count One pursuant to Fed.R.Civ.P. 54, and defendants' cross-motion for summary judgment as to all counts of the complaint. Upon careful consideration of the pleadings and exhibits and the entire record, the Court grants in part and denies in part both motions.

### Background

This action arises from an alleged breach of contract by defendant of a consulting agreement between the parties. Plaintiff Joel Popkin and Company (JPC), and its president, Joel Popkin, are in the business of economic consulting. Defendant Wharton Econometric Forecasting Associates, Inc. (Wharton), is in the business of economic forecasting. Defendant Ziff-Davis Publishing Co., Inc., had an indirect controlling interest in Wharton, and allegedly guaranteed its obligations to JPC. JPC and Wharton entered into a consulting

agreement (hereinafter referred to as the Agreement) on May 8, 1981, pursuant to which plaintiff was to provide consulting services to assist in the development and marketing of defendant's proposed new Models for providing econometric forecasts of the prices of certain key commodities and key economic sectors. Under the first part of the Agreement, plaintiff delivered to defendant certain information and specifications for the Models. There is no dispute that plaintiff was paid fully for this portion of the work.

The second part of the Agreement, and the area of alleged breach, was for "Ongoing Model Support Functions." *See* Section 4 This phase began after the completion of part one, with "the commencement of forecasting services to Wharton's clients using the Models...." Section 3.1. This phase began in November of 1981. The Agreement provides that "[plaintiff] shall provide up to 72 working days per each twelve-month period thereafter in support of the Industrial Service Division or other divisions offering the Models." Section 3. During compensation negotiations, plaintiff originally sought a large percentage of the profits after the Model development period, rather than a flat fee. However, the negotiations resulted in a compensation provision which entitled plaintiff to five percent of the net profits received by defendant, *see* Section 3.3(ii), and to

> a support fee, payable quarterly, for each twelve-month period in which [plaintiff] *shall be required* to supply support services. For the first twelve-month period, the total support fee shall be $45,-000. The fee for each subsequent twelve-month period shall be increased by the percentage increase in the GNP deflator during the immediately preceding four calendar quarters.

Section 3.3(i) (emphasis added).

It is this provision which is in dispute. As the venture has not shown a profit, no royalty has been paid under Section 3.3(ii). Until the events of late July 1984 which gave rise to this suit, defendant Wharton always paid plaintiff, on a quarterly basis, the fee for support services. The contract term was for ten years, which period was thereafter to continue from year to year unless either party gave 90 days' notice. *See* Section 6.1. In addition, certain rights of termination, and obligations upon their exercise, were provided. *See* Sections 6.2, 6.3. One such provision was a non-competition clause by JPC. Section 7.

Defendant Wharton states that it changed, added to, and deleted many of the specifications for the Models provided by JPC. Defendants also state that from its very inception, the Industry Services proved to be a financial failure and Wharton consistently lost substantial sums on that service. A new president, Bruce Lippke, was named for defendant Wharton. Due to the failure of defendant's Industry Services division, Lippke, on more than one occasion, requested plaintiff to renegotiate the compensation provision of Section 3.3(i). Plaintiff declined to renegotiate this provision, but promised to increase its marketing input. Despite these added efforts, the division continued to fail.

On July 25, 1984, Lippke wrote a "confidential" letter to Joel Popkin. The letter noted the lack of improvement in the finances and growth of the Industry Services division, and stated that defendant would have to make "further changes to reduce [the] losses," although he "would prefer to maintain some form of cooperative efforts with [plaintiff] ... at a much reduced level of support and compensation."

On July 26, Lippke sent another letter to plaintiff. Citing the differences between the Models as contemplated under the Agreement and their final form (which, defendant Wharton maintained, reduced plaintiff's role in providing ongoing support functions), Wharton gave notice that the support services would no longer be required and that the support fee specified in Section 3.3(i) would not be paid after the quarter that was to end in October. Defendant did, however, recognize its obligation under the royalty provision, although due to the lack of profits no actual royalties have been paid. The letter concluded by Lippke's stating that "[i]f you wish to pursue such a course [of restruc-

turing their contractual relationship] we propose that the Agreement be amended." A proposed amendment was attached.

Plaintiff filed this action on the basis of breach of contract and conversion. The breach of contract claim is based on defendant's alleged anticipatory breach of the Agreement by indicating it would not pay the support fee for the rest of the term of the Agreement. Plaintiff demands the entire support fee sum of $332,019. Plaintiff also alleges that defendants have violated provisions of the Agreement requiring that if defendants terminate the contract, Wharton shall cease offering services or products using the Models and to return to JPC a copy of the Models documentation. *See* Sections 6.2, 6.3. Plaintiff bases its claim of conversion on the allegation that defendants are keeping the Models and continuing to sell service based upon them to the public.

### *Discussion*

#### I. *The Breach of Contract Claim*

Both JPC and Wharton move for summary judgment on the breach of contract claim, each claiming that the unambiguous language of the Agreement supports its position.[1] For reasons discussed below, the Court concludes that JPC is entitled to partial summary judgment under any one of three different analyses. First, Wharton breached the unambiguous language of the Agreement by failing to pay the full support fee for a 12–month period during which JPC provided support services. Second, Wharton anticipatorily breached the unambiguous language of the Agreement by notifying JPC that Wharton would no longer require support services, and would no longer pay the annual support fee. Finally, to the extent that the language of the Agreement may be considered to be ambiguous, JPC has established beyond genuine dispute that Wharton's actions violated the intent of the contracting parties.

#### A. *Failure To Pay The Full Support Fee for 1983–84*

Wharton does not challenge JPC's contention that the support phase of the contract, as defined by Section 3.1 of the Agreement, commenced on November 1, 1981. It also is undisputed that Wharton paid the annual support fee, in quarterly installments, for the 12–month periods commencing on November 1, 1981, and November 1, 1982. Finally, the parties agree that Wharton made quarterly payments for the first three quarters of the period commencing on November 1, 1983. JPC argues that regardless of the legitimacy of Wharton's refusal to pay the annual support fee for future 12–month periods, a breach occurred when Wharton refused to pay the final quarter of the 1983–84 support fee.

Section 3.3(i) of the Agreement obligates Wharton to pay "a support fee ... for each twelve-month period in which JPC shall be required to supply support services." Even under Wharton's interpretation of the "shall be required" language, it is clear that support services were required during the 12–month period from November 1, 1983, to October 31, 1984. Accordingly, Wharton was obligated to pay, in quarterly installments, a support fee of $49,188 for that period.

■ Under Pennsylvania law, as under the common law of contracts, the Court is bound to enforce the plain language of a contract. *E.g., Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). Wharton, although arguing vigorously that the Agreement permits it to determine the years in which the support fee will be paid, makes no argument to support the position that the Agreement also permits Wharton to make that determination on a quarterly basis. Thus, the Court agrees with JPC that Wharton breached the Agreement in 1984, when Wharton refused to pay JPC the final quarter of the 1983–84 support fee.

---

**1.** The contract provides that its interpretation is to be governed by the law of the State of Pennsylvania. *See* Section 10(c).

B. *Repudiation Of The Obligation To Pay The Annual Support Fee*

The parties' primary point of conflict is whether Section 3.3(i) of the Agreement obligates Wharton to pay the annual support fee if Wharton chooses not to request support services. In essence, the parties disagree over the meaning of the term "required": Wharton claims that it means "required by Wharton," and JPC claims that it means "required by the Agreement." As both parties recognize, "a contract must be construed as a whole, and the intention of the parties ... collected from the *entire* instrument and not from detached portions, it being necessary to consider all of its parts in order to determine the meaning of any particular part as well as of the whole." *Mowry v. McWherter*, 365 Pa. 232, 74 A.2d 154, 158 (1950) (emphasis in original); *see also Thermice Corporation v. Vistron Corporation*, 528 F.Supp. 1275, 1284 (E.D.Pa.), *aff'd mem.*, 688 F.2d 825 (3d Cir.1981). Accordingly, the Court's task is to examine the parties' interpretations against the backdrop of the entire contract, and determine whether either interpretation, or both, is consistent therewith.

■ After careful consideration of the totality of the contract, the Court concludes that Section 3 of the Agreement creates an ongoing, retainer-like relationship between the parties, under which JPC is obligated to remain ready to provide support services, as necessary, and under which Wharton is obligated to pay JPC an annual fee for each year of the support phase of the Agreement, regardless of the amount of support services actually required. This concept is expressed in Section 1, which states: "Wharton hereby hires JPC, and JPC agrees to serve, as consultant to Wharton during the term of this agreement to provide those services hereinafter set forth in this agreement. JPC shall perform those services faithfully, diligently and competently." Similarly, Section 3.1 requires that once the model preparation phase is complete, "JPC shall provide *up to* 72 working days [of support services] per *each* twelve-month period thereafter...."

(emphasis added). Wharton effectively concedes this retainer relationship when it acknowledges that JPC is "obligated *to be available* for support services during the term of the Agreement." [Defendants' Reply to Plaintiff's Opposition to Defendants' Cross-Motion For Summary Judgment at 5 n.* (emphasis in original).]

Equally persuasive is the structure of the support service provision. Section 3.3(i) fixes a flat, annual support fee, the size of which has no relationship to the number of hours actually expended. If the parties had intended to tie compensation to Wharton's actual year-to-year or month-to-month need for support services, as Wharton suggests, they would not have chosen a system under which Wharton would pay the same price for one hour of support that it would pay for 72 hours of support. When the parties wished to tie compensation to the amount of services provided, they did so. *See* Section 2.3 (compensation for model development services); Section 4.1 (compensation to JPC for services provided to Wharton clients); Section 4.2 (compensation to Wharton for services provided to JPC clients). Wharton's interpretation is neither logical nor consistent with other provisions of the Agreement.

When the Agreement is viewed as a whole, the reason for use of the superficially confusing "required" language is readily apparent. The parties intended for their relationship to occur in two stages: model development and model marketing. As with any creative process, it was not feasible to set a rigid deadline for completion of the development phase of the venture and for the commencement of the marketing phase. This explains the use of "twelve-month periods" rather than years beginning and ending on fixed calendar dates. *See* Section 3.1. Moreover, JPC's compensation was to be calculated differently for the two phases; its right to the annual support fee was not to ripen until Wharton began to market the completed Models. Section 3.3(i)'s language that JPC would be entitled to the annual fee "for each twelve-month period in which JPC shall be required to supply support services" is best understood as providing the necessary dis-

tinction between the two phases of the venture.

Wharton's argument essentially is that "when required" should be read as the equivalent of "when requested by Wharton." However, the Agreement indicates that the parties knew how to use the word "requested" when they intended to leave a particular decision to Wharton's discretion. Section 3.1 refers to "support services as requested by Wharton"; the parties could have included similar language in Section 3.3(i) as well, if that had been their intention. On balance, JPC's interpretation of the contract is both logical and supported by the overall structure of the Agreement, while Wharton's interpretation possesses neither quality. Since there is only one reasonable interpretation of the contract, the terms must be considered unambiguous and summary judgment is appropriate. *See, e.g., Bear Brand Hosiery Company v. Tights, Inc.,* 605 F.2d 723, 726 (4th Cir. 1979).

### C. *Extrinsic Evidence Of The Parties' Intent*

█ Summary judgment would be appropriate even if the Court were to conclude that the Agreement's language was sufficiently ambiguous to make both JPC's and Wharton's interpretation reasonable. Where ambiguity exists, the Court may reach beyond the text of a contract to examine extrinsic evidence, including evidence of the circumstances surrounding the contract's execution. *Department of Transportation v. Bracken Construction Company,* 72 Pa.Commw. 620, 457 A.2d 995, 998–99 (1983). When extrinsic evidence demonstrates that only one possible interpretation is reasonable, the Court may grant summary judgment. *Hewes v. McWilliams,* 412 Pa. 270, 194 A.2d 339, 342 (1963); *see also Over The Road Drivers, Inc. v. Transport Insurance Company,* 637 F.2d 816, 818–19 (1st Cir.1980).

JPC has provided several declarations to support its claim that the contracting parties intended to obligate Wharton to pay the annual support fee regardless of whether Wharton actually requested such services during a particular year. Joel Popkin, JPC's president and chief negotiator of the Agreement, states that he originally requested one-third of the Models' profits in exchange for his ongoing support service. Wharton rejected this proposal, offering instead a five percent interest in the profits, coupled with "an annual support fee of $45,000 'for the life of the contract' " with adjustment to the annual fee to reflect inflation.

While the self-serving statements of a party ordinarily would add little force to the motion, JPC goes a step further by providing corroborative declarations from individuals involved in the negotiations on behalf of Wharton. Charles B. Warden, Jr., the Chief Executive Officer of one of Wharton's sister companies at the time the Agreement was negotiated, attended several negotiation sessions. Warden confirms Popkin's description, and claims that such "guaranteed" consulting contracts were often executed on behalf of Wharton's parent company at that time, Ziff-Davis Publishing Company. Additionally, Lee R. Morris, Wharton's president at the time the Agreement was negotiated and executed, states that when he first learned of the terms of the Agreement, he questioned the fiscal responsibility of making such a large financial commitment in connection with a product that had yet to be developed. Morris was informed that such an arrangement was necessary to ensure the continuous availability of Popkin's services. He confirms Warden's statement that such agreements were not unusual at that time, and states that while president of Wharton, he considered the annual support fee to be an obligation that could be avoided only by terminating the Agreement.

█ Taken as a whole, JPC's declarations provide authoritative and credible support from both sides of the negotiating table for its position. Unrefuted, they are sufficient to resolve any factual dispute over the parties' intent. Wharton, rather than presenting extrinsic evidence to refute JPC's declarations, clings to the faulty premise that this Court may not rely on

unopposed affidavits to resolve factual disputes at the summary judgment stage. *See* Defendants' Reply at 10 ("extrinsic evidence that may provide insight into the intent of the parties should be considered only in the context of a complete inquiry at trial"). While the Court might be inclined to accept such a proposition if faced with conflicting affidavits, that is not the case here.

Wharton's responsibility to controvert JPC's declarations is found in Fed.R.Civ.P. 56(e), which provides in relevant part:

When a motion for summary judgment is made and supported [by affidavits] as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

This language was added in 1963 to address just the type of situation presented here. *See* Notes of Advisory Committee on Rules, 1963 Amendment to Fed.R.Civ.P. 56 ("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."); *see also Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 2554, 91 L.Ed.2d 265 (1986). Although Wharton has produced affidavits in support of its cross-motion for summary judgment, none address the material factual issue of the contracting parties' intent. Wharton thus has failed to identify any evidence that would justify ultimate submission of the issue to the finder of fact. Accordingly, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (D.D.C.1978).

■ Having held that, as a matter of law, Wharton was obligated to pay JPC for support services, the Court addresses the issue of damages. Wharton breached the Agreement when it failed to pay JPC for the fourth quarter of the 1983–84 year, and continues to breach the Agreement by refusing to pay JPC for subsequent quarters, as they occur. Moreover, Wharton anticipatorily breached the Agreement in July of 1984, when Wharton's president informed JPC that Wharton no longer intended to pay JPC the annual fee. *See Wolgin v. Atlas United Financial Corp.,* 397 F.Supp. 1003, 1014 (E.D.Pa.1975), *aff'd mem.,* 530 F.2d 966 (3d Cir.1976) (applying the Pennsylvania rule on anticipatory breach). Under Pennsylvania law, an employer who anticipatorily breaches an employment contract by announcing his intention to cease payments is liable "for the stipulated salary for the balance of the employment term." *Id.* The Court sees no principled difference between an employment contract and the consulting contract at issue here, nor does Wharton suggest one. Accordingly, JPC is entitled to the support payments due from August 1, 1984, to the expiration of the Agreement on May 7, 1991.

■ Although summary judgment is appropriate on the issue of liability, the Court cannot grant summary judgment with respect to the amount of damages because of uncertainties as to the proper total due under the Agreement. First, Section 3.3(i) mandates an adjustment in the yearly fee based on the effects of inflation during the preceding twelve months. Plaintiff presents no method by which the Court can calculate the future values of the support fee, and therefore a material issue of fact remains in genuine dispute. Second, although the Agreement was to expire on May 7, 1991, the last full 12–month support period will end on October 31, 1990. The Agreement provides no guidance as to how the remaining seven months of the contract life should be treated under Section 3.3(i), thus creating another material factual issue to be resolved. Contrary to JPC's assertion that calculation of damages is merely "a simple mathematical calculation," there are factual issues precluding summary judgment as to the amount of liability.

## II. *Request For Rule 54(b) Certification*

In light of the factual issues that remain with regard to the amount of damages due

for breach of the Agreement, entry of a final judgment on behalf of JPC pursuant to Fed.R.Civ.P. 54(b) would be inappropriate.

### III. *Wharton's Cross-Motion For Summary Judgment*

The Court's resolution of JPC's motion for summary judgment requires denial of Wharton's cross-motion for summary judgment on the breach of contract and conversion claims because Wharton's position with respect to both is that no breach of the Agreement ever occurred. However, JPC's "best efforts" claim rests on an entirely distinct legal and factual basis, and therefore warrants independent consideration.

Section 5 of the Agreement defines Wharton's rights and obligations incident to the marketing of the Models:

> Subject to the rights of JPC specifically set forth in this agreement, Wharton shall have all ownership rights in the Models and shall have full discretion in the marketing and management of the Models including, without limitation, the sole right to determine the scope of services offered, discontinuation or commencement of any services, configuration, pricing, consultation, support, staff, salaries and other similar marketing management policies and decisions except that Wharton shall not discontinue offering any services based upon the Models prior to December 31, 1983, and while Wharton continues to offer services based upon the Models during the term of this agreement, Wharton shall use its best efforts, commensurate with the reasonable potential market for those services and the resources reasonably available to Wharton for those efforts, to diligently market those services.

JPC alleges that Wharton breached its duty under Section 5 by unnecessarily restricting its marketing efforts and expenditures, by employing incompetent marketing personnel, and by failing to make personal computer applications of the Models available in a timely manner. JPC's sole support for its allegations comes from Joel Popkin.

In support of its motion for summary judgment, Wharton provides the affidavits of Bruce R. Lippke, present president of Wharton, and Nariman Behravesh, manager of Wharton's U.S. operations division. Lippke relates that Wharton expended "substantial financial resources" and devoted "numerous marketing personnel" to marketing the Models, and describes several efforts that Wharton made in conjunction with Joel Popkin in an effort to make the Models profitable. Behravesh goes even further, stating that the services built around the Models have "been the object of greater marketing efforts than those used to promote Wharton's other U.S. services."

■ The standard to be applied here is analogous to the standard applied by the Court on a motion for a directed verdict. *Anderson v. Liberty Lobby, Inc., supra,* 106 S.Ct. at 2511. Thus, the Court must determine if the parties' evidence, if introduced at trial, would justify submission of the issue to a jury. *Id.* at 2512. In light of the substantial discretion granted to Wharton under Section 5, the Court concludes that JPC has failed to demonstrate any likelihood that it can meet its burden of proof at trial. In essence, JPC has done nothing more than allege that Wharton made a number of bad business decisions, yet these are just the sort of decisions delegated by Section 5 to Wharton's judgment. The fact that Wharton stood to lose 95 percent of the potential profits, compared to JPC's five percent, negates any unsupported inference of intentional mismanagement. In short, JPC chose to bargain away its right to "second guess" Wharton's business judgment, and Wharton's motion for summary judgment is granted on the "best efforts" issue.

### *Conclusion*

The Court concludes that plaintiff's motion for summary judgment should be granted in part and denied in part. There are no genuine issues of material fact with respect to Wharton's liability for breach of the Agreement and therefore summary judgment is granted on the issue of liability

under Count One of the complaint. However, factual issues remain with respect to the amount of damages due under the Agreement, and therefore summary judgment is denied on the issue of damages. Because of the remaining factual issues involving damages, entry of final judgment under Fed.R.Civ.P. 54(b) is inappropriate. Moreover, the Court concludes that factual disputes preclude the granting of defendants' motion for summary judgment on Count Two of the complaint, but not on Count Four. Thus, Count Two and the issue of damages under Count One remain for trial. An appropriate Order accompanies this Memorandum Opinion.

## ORDER

This case now is before the Court on plaintiff's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 and for an entry of final judgment as to Count One of the complaint pursuant to Fed.R. Civ.P. 54(b), and on defendants' cross-motion for summary judgment. Upon careful consideration of the pleadings and exhibits and the entire record, for the reasons set forth in the accompanying Memorandum Opinion it hereby is

ORDERED, that plaintiff's motion for partial summary judgment is granted with respect to defendants' liability under Count One of the complaint, and denied with respect to the amount of damages recoverable under Count One of the complaint. It hereby further is

ORDERED, that plaintiff's motion for entry of final judgment on Count One of the complaint is denied. It hereby further is

ORDERED, that defendants' cross-motion for summary judgment is granted with respect to Count Four of the complaint, and denied with respect to Counts One and Two of the complaint. It hereby further is

ORDERED, that Count Four of the complaint is dismissed with prejudice.

SO ORDERED.